# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Limitless Mobile, LLC, | : | Case No. 16-12685 |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION OF RICHARD B. WORLEY
## IN SUPPORT OF FIRST DAY MOTIONS

I, Richard B. Worley, hereby declare under penalty of perjury:

1. I am the Chairman and a director of the above-captioned debtor, (the "Debtor"), and Chairman and a director of its non-debtor parent, Limitless Mobile Holdings, LLC. In these capacities, I am generally familiar with the Debtor's day-to-day operations and business and financial affairs.

2. On the date hereof (the "Petition Date") the Debtor filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor intends to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case and, as of the date of the filing of this declaration (this "Declaration"), no official committees have been appointed or designated.

3. To enable the Debtor to reduce the adverse effects of the commencement of this chapter 11 case on its organization, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtor to effectively

transition into chapter 11 and minimize disruption, thereby preserving and maximizing the value of the Debtor's estate.

4.      I am familiar with the contents of each First Day Motion (including the exhibits and schedules in support thereof), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

5.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of the Debtor's management and the Debtor's advisors. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      Part I of this Declaration describes the Debtor's history and operations, its capital and debt structure and the circumstances surrounding the commencement of this chapter 11 case. Part II sets forth the relevant facts in support of each of the First Day Motions.[1]

## I.     BACKGROUND

**A.     The Debtor's History and Corporate Structure**

7.      The Debtor, successor to Keystone Wireless, LLC, is a Delaware corporation formed in 2013 with a mission to construct a broadband network and provide wireless telecommunications services to nine (9) rural and underserved counties of Central Pennsylvania.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

8. Limitless has built a $40 million state-of-the-art 3G/4G LTE network that has increased access to reliable, high quality mobile phone and home internet services in rural areas and is currently providing service to approximately 3500 retail customers. Limitless's network and infrastructure also makes it an attractive partner for providing wholesale services to national carriers.

9. The Debtor is headquartered in Harrisburg, Pennsylvania and has several retail store locations in central Pennsylvania.

10. Prior to the Petition Date, the Debtor employed 40 individuals in full and part-time capacities. Because the Debtor's restructuring will require a downsizing of its retail operations, it has made the difficult decision to reduce its retail-side workforce by approximately half. It also intends to effectuate an orderly transition of existing customers to other carriers that can provide service of the quality that Limitless currently provides.

11. Limitless Mobile Holdings, LLC, is the 100% owner of the Debtor. Limitless Mobile Holdings, LLC, also has certain affiliates and subsidiaries operating in Europe (together with the Debtor, the "Limitless Group"). An organizational chart of the Limitless Group is attached hereto as Exhibit "A."

12. As reflected in the organizational chart attached hereto as Exhibit "A," Limitless Mobile Holdings, LLC, is the ultimate parent of, among others, Limitless Mobile GmbH, an entity incorporated in Germany, and Limitless Mobile Limited, an entity incorporated in the UK. As indicated on the chapter 11 petition filed in connection with this chapter 11 case, each of those entities is the subject of insolvency proceedings in Germany and the UK, respectively.

13. Historically, the Debtor has borrowed money from one or more of its affiliates, and in some cases those loans have been forgiven or capitalized, all of which will be detailed in the Debtor's schedules.

14. The Officers of the Limitless Group are the following individuals:

    Group CEO:  Atte Miettinen

    Group CFO:  Jeremy Brett

    Group CTO:  Jim Croal

15. The Officers of the Debtor are the following individuals:

    COO:  Amir Rajwany

    Senior Vice President:  Bill Baldwin

16. The directors of the Debtor, in addition to myself, are the following individuals:

    Sarah Miller Coulson

    Peter Morse

    Robert C. Martin

**B.  The Debtor's Debt and Capital Structure**

17. On or about September 24, 2010, the Debtor's predecessor-in-interest, Keystone Wireless, LLC, entered into a Loan/Grant and Security Agreement with the United States of America, acting through the Administrator of the Rural Utilities Service (the "<u>RUS Award</u>"). The RUS Award provided for a term loan (the "<u>RUS Loan</u>") in the original principal amount of $11,096,780, secured by first priority liens on and security interests in substantially all of the Debtor's real and personal property, including accounts, inventory, other tangible property, intangibles and the proceeds of the foregoing acquired with RUS Award proceeds (collectively, the "<u>Collateral</u>").

18. The RUS Award also provided for a Grant of $25,286,105, awarded to the Debtor in conjunction with the RUS Loan for the purpose of building out telecom infrastructure and providing wireless broadband access to the rural communities Limitless now serves.

19. As of the Petition Date, the Debtor is obligated under the RUS Loan in the approximate aggregate amount of $9,219,000. The Debtor believes that, as of the Petition Date, the aggregate amount of the RUS Loan exceeds the value of the Collateral.

20. In early 2016, as the Debtor had nearly completed the buildout of its network and required additional capital to achieve a retail-side network launch, the Debtor, with the approval and written consent of RUS, incurred additional debt to fund rollout efforts.

21. Accordingly, on or about May 24, 2016, the Debtor entered into a $9,000,000 credit facility with Tower Bridge LLM Partners, LLC (the "Tower Bridge Loan"), which facility is secured on a *pari passu* basis with the RUS Loan on the same Collateral.

22. As of the Petition Date, the Debtor is obligated under the Tower Bridge Loan in the approximate aggregate amount of $8,900,000. As with the RUS Loan, the Debtor believes that, as of the Petition Date, the aggregate amount of the Tower Bridge Loan exceeds the value of the Collateral.

23. In addition to debt, the Debtor has benefited from infusions of equity from Limitless Mobile Holdings, LLC, which approximate $35 million over the last three (3) years, as well as the contribution of spectrum valued at $10 million. This capital and spectrum, in addition to the RUS and Tower Bridge Loans, enabled the buildout of the Debtor's network.

C.    **Events Leading to the Commencement of this Chapter 11 Case**

24. Due to continued, increased costs and delays in network buildout, which have repeatedly extended the required runway to profitability, the Debtor cannot sustain its current

business model absent significant infusions of additional capital, which it could not attract because of its excessive debt burden.

25. Thus, the Debtor has determined that it needs to reorganize by reducing and restructuring its debt, scaling back its retail efforts, and focusing its attention on the wholesale opportunities that its infrastructure also enables.

26. As such, the Debtor has made the difficult but necessary decision to seek the protections of chapter 11 in this Court, in which forum it believes it can effectuate an orderly winddown of a significant portion of its retail-side business, sell some of its retail-side assets, make distributions to creditors, and emerge with a viable wholesale operation.

**D.      Objectives of this Chapter 11 Case**

27. The Debtor intends to seek confirmation of a chapter 11 plan providing for the winddown of a significant portion of the retail business and reorganization and continuation of the wholesale business as a going concern, to be funded by ongoing wholesale business operations and postpetition DIP financing provided by its prepetition lender, Tower Bridge LLM Partners, LLC.

## II.      FIRST DAY MOTIONS

28. Concurrent with the filing of its chapter 11 petition, the Debtor has filed the First Day Motions. The Debtor requests that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in minimizing disruption in the Debtor's operations and maximizing value for the benefit of all parties in interest.

29. The relief sought in the First Day Motions will diminish the adverse impact of the filing of this case on the Debtor, its employees, customers, and vendors. I believe that the relief sought in each of the First Day Motions is essential to enable the Debtor to make a seamless

transition into chapter 11 and operate effectively as a debtor-in-possession. I believe that the First Day Motions are tailored to address those matters that require urgent and immediate attention by this Court in order to sustain the value and the viability of the Debtor's operations and estate.

A.  **Application for an Order Appointing Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Local Rule 2002-1(f) (the "Claims Agent Appointment Application")**

30. By the Claims Agent Appointment Application, the Debtor seeks appointment of Rust Consulting/Omni Bankruptcy, ("Rust Omni"), as claims and noticing agent pursuant to 28 U.S.C. § 156(c). Because Local Bankruptcy Rule 2002-1(f) requires that a debtor with more than 200 creditors retain a claims and noticing agent within seven (7) days of the filing of a bankruptcy petition, and because the Debtor anticipates that there will be in excess of 200 creditors in this case, the Debtor believes it is prudent and appropriate to seek Rust Omni's appointment at this time.

31. I believe that Rust Omni is well-qualified to serve as Claims Agent in this chapter 11 case, and its engagement and employment will provide the Debtor with efficient and effective management of the various administrative processes that accompany a chapter 11 proceeding. This assistance will enable the Debtor's management and other advisors to focus on the Debtor's restructuring efforts. Therefore, I believe that the relief sought in the Claims Agent Appointment Application is in the best interests of the Debtor, its estate, and all parties in interest and, as such, should be approved.

**B.      Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Renew Prepetition Insurance Policies and Pay All Obligations in Respect Thereof and (II) Granting Related Relief (the "<u>Insurance Motion</u>")**

32.     In connection with the operation and management of its business, the Debtor maintains numerous insurance policies, providing coverage for, among other things, commercial property (including retail stores), automotive, general liability, umbrella, and excess umbrella, as well as commercial crime and fidelity coverage (collectively, the "<u>Insurance Policies</u>").  A Schedule of the Insurance Policies is attached to the Insurance Motion as Exhibit C.

33.     The Debtor believes that the continuation of the Insurance Policies is essential to the ongoing operation of the Debtor's businesses, retail and wholesale.  The Debtor intends to continue making premium payments through its premium financing provider, First Insurance Funding, as they come due in the ordinary course.  The Debtor is current on all premium payments and files the Insurance Motion out of an abundance of caution, to the extent any prepetition payments have not yet cleared or, unbeknownst to the Debtor, are currently owed.

34.     By the Insurance Motion, the Debtor requests authority to continue the Insurance Policies uninterrupted and pay any pre- or post-petition amounts related to the Insurance Policies to the extent that the Debtor determines, in its discretion, that payment is necessary or appropriate.

**C.      Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and (II) Granting Related Relief (the "<u>Taxes Motion</u>")**

35.     In the ordinary course of its business, the Debtor incurs sales tax, gross receipts tax, franchise taxes, statutory surcharges, federal regulatory contributions and other tax obligations that must be paid in order for the Debtor to continue to operate its broadband network.

36. Accordingly, by the Taxes Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to pay certain tax obligations as they come due, certain of which may relate to the prepetition period.

37. Payment of these obligations in the ordinary course of business is essential to the Debtor's ability to continue operating its business in compliance with state and federal law and without incurring interest and penalties on unpaid tax obligations. As such, I believe, and the Debtor submits, that the relief requested in the Taxes Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest and should be approved.

**D.     Motion of the Debtor for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utility Motion")**

38. In the ordinary course of business, the Debtor obtains data/internet, electric and other similar utility services provided by a number of utility companies (the "Utility Providers"). The Utility Providers service the Debtor's offices in Harrisburg, Pennsylvania and various retail locations. Preserving utility services on an uninterrupted basis is essential to the Debtor's ongoing operations and reorganization efforts. Indeed, any interruption of utility services, even for a brief period of time, would disrupt the Debtor's ability to provide services to customers, and to effectuate an orderly transition of retail-side customers to other providers. Such a result could seriously jeopardize the Debtor's reorganization efforts and, ultimately, creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during this chapter 11 case.

39. By the Utility Motion, the Debtor seeks the entry of interim and final orders: (a) determining that its Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtor's proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional

or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtor's proposed adequate assurance; (d) establishing procedures for the Utility Providers to object to the Debtor's proposed adequate assurance procedures; and (e) determining that the Debtor is not required to provide any additional adequate assurance, beyond what is proposed by the Utility Motion.

40. Such relief is necessary to enable the Debtor to continue its business operations and winddown efforts uninterrupted by threats of potential termination of, suspension or interruption in utility services. Accordingly, I believe, and the Debtor submits, that the relief requested in the Utility Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest and, as such, should be approved.

E. **Motion of Debtors to Pay Certain Pre-Petition Payroll and Various Employee Benefit Expenses Pursuant to 11 U.S.C. §§ 105(a)(1), 502(f) and 507(a)(4) (the "Wages Motion")**

41. To minimize the personal hardship that the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtor's downsizing workforce during this critical time, by the Wages Motion, the Debtor seeks authority to pay and honor, in its sole discretion, certain prepetition claims for, among other items: wages, salaries, bonuses and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including, garnishments, Employees' share of insurance premiums, taxes, and 403(b) contributions), health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, life insurance, long-term and short-term disability coverage, floating holidays and all other benefits that the Debtor has historically provided in the ordinary course of business and to pay all costs incident to the foregoing.

42. Additionally, the Debtor requests confirmation that the Debtor may, in its sole discretion, continue its prepetition employee incentive programs in the ordinary course of business. In an abundance of caution, the Debtor requests the right to modify, change, and discontinue any of its employee compensation, programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during this chapter 11 case in its sole discretion without the need for further Court approval.

43. The Debtor's employees have been and continue to be the lifeblood of the Debtor's business. Accordingly, even in a difficult time of downsizing, it is my belief that there is ample justification for the relief requested in the Wages Motion and that the granting of such relief is in the best interests of the Debtor, its estate, and all parties in interest to this case.

F. **Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing Continued Use of the Debtor's Existing Cash Management System and Bank Accounts; (II) Waiving Certain United States Trustee Requirements; and (III) Granting Related Relief (the "Bank Accounts Motion")**

44. The Debtor seeks entry of interim and final orders authorizing the Debtor to maintain its existing Cash Management System, Bank Accounts, and Business Forms (as those terms are defined in the Bank Accounts Motion). The Debtor also requests that the Court authorize the Debtor's banks to continue to maintain, service and administer the Bank Accounts.

45. The Debtor further requests that it be authorized to continue to use all correspondence and business forms, including books and records which existed immediately before the Petition Date, as the changing of Business Forms would be costly, burdensome, and disruptive at this time.

46. I believe that the relief requested in the Bank Accounts Motion is essential to facilitating a seamless transition into chapter 11. Accordingly, I believe that approval of the

11

relief sought in the Bank Accounts Motion is in the best interest of the Debtor's estate, its creditors, and all parties in interest.

**G.  Motion of Debtor for Entry of an Order (I) Authorizing it to Honor or Pay Certain Prepetition Obligations to Customers and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief (the "Customer Deposits Motion")**

47. In the Customer Deposits Motion, the Debtor seeks (i) authority, in its sole discretion, to honor or pay certain prepetition obligations to customers in the ordinary course of the Debtor's business and (ii) direction to applicable banks and other financial institutions to receive, process, and pay any and all checks and other transfers related customer obligations.

48. Specifically, in the ordinary course of its business, the Debtor collects and maintains Customer Deposits (as defined in the Motion), typically in the amount of $100.00 to secure certain equipment.

49. Because the Debtor is anticipating a winddown of its retail-side operations, it also anticipates that certain of these Customer Deposits will need to be returned in the ordinary course of business.

50. In order to maintain goodwill and preserve the value of its operations for the benefit of all parties in interest, the Debtor believes that the relief requested in the Customer Deposits Motion is essential and should be approved.

**H.  Motion of Debtor for Interim and Final Orders (a) Authorizing the Debtor to Use Cash Collateral of Existing Secured Lenders and Granting Adequate Protection for Use and (b) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing (the "Cash Collateral Motion")**

51. The Debtor seeks entry of an interim order authorizing the Debtor to use the Cash Collateral of the prepetition secured Lenders (as defined in the Cash Collateral Motion), granting adequate protection to the Lenders, and prescribing the form and manner of notice and setting the time for the final hearing on the Cash Collateral Motion.

52. In the absence of access to Cash Collateral, the Debtor's operations would be hindered and the value of the Lenders' collateral would be thoroughly diminished. Indeed, without the use of Cash Collateral, combined with access to DIP financing, the Debtor will suffer immediate and irreparable harm, its business operations will be shuttered, and all going concern value will be lost.

53. As set forth fully in the Cash Collateral Motion (and in connection with the DIP Motion described below), the Debtor has proposed a Budget that it believes is reasonable, and has offered to adequately protect the Lenders' interests.

54. Therefore, I believe and the Debtor submits that the use of Cash Collateral on the terms set forth in the proposed Interim Order and corresponding Budget is in the best interests of the Debtor, the Lenders, and all parties in interest. As such, the relief requested in the Cash Collateral Motion should be granted.

I.  **Motion of Limitless Mobile, LLC for Entry of Interim and Final Orders: (I) Authorizing it to Obtain Post-Petition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Authorizing it to Enter into the Debtor-in-Possession Credit Agreement, and (III) Granting Administrative Priority Claims to DIP Lender Pursuant to Section 364 of the Bankruptcy Code and Modifying the Automatic Stay to Implement the Terms of the DIP Order (the "DIP Motion").**

55. By the DIP Motion, the Debtor the Debtor seeks (a) entry of interim and final orders authorizing the Debtor to (i) obtain loans and in an aggregate principal amount not to exceed $4,000,000, (ii) enter into the DIP Credit Agreement and the agreements and instruments contemplated thereby, and (iii) grant administrative priority claims to Tower Bridge LLM Partners, LLC (the "DIP Lender") in accordance with the DIP Credit Agreement documents; (b) modification of the automatic stay to the extent necessary to permit the Debtor and the DIP Lender to implement the terms of the DIP finacing; (c) requesting that the Court schedule a final hearing on the DIP Motion to be held within twenty-five (25) days after the entry of the Interim

Order (as defined in the DIP Motion); and (d) requesting that an emergency interim hearing on the DIP Motion be held for the Court to consider entry of the Interim Order, which authorizes the Debtor to borrow funds under the DIP Credit Agreement, on an interim basis, up to an aggregate principal amount not to exceed $1,000,000.

56.    In the absence of access to a DIP credit facility, the Debtor cannot continue operations, pursue an orderly winddown of its retail operations, or otherwise preserve going concern value.  Indeed, the Debtor has very little operating cash remaining, and extremely limited availability on its prepetition credit facility with Tower Bridge LLM Partners, LLC ("Tower Bridge").

57.    Tower Bridge, in which I am a participant, has agreed to extend post-petition DIP financing to the Debtor on an unsecured basis, in exchange for allowed administrative priority claims in this chapter 11 case, in accordance with the DIP Credit Agreement and the DIP Orders. The Debtor believes that these are the best terms on which it could obtain critical post-petition financing.  In the absence of such funding, the Debtor would need to shutter its operation immediately and pursue a fire sale of assets.  Such a result benefits no one.

58.    Therefore, I believe and the Debtor submits that the use of the DIP Facility, on the terms set forth in the proposed DIP Credit Agreement, Budget, and DIP Orders is in the best interests of the Debtor, the estate, and all parties in interest.  As such, the relief requested in the DIP Motion should be granted.

### III.    CONCLUSION

59.    For all of the foregoing reasons and those more fully set forth in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as the Court may deem appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my knowledge, information, and belief as set forth in this Declaration.

Dated: December 1, 2016

_____
Richard B. Worley
Executive Chairman